UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

THOMAS K. BARRY,

                                    Plaintiff,

                                                            DECISION AND ORDER

            -v-
                                                            07-CV-6388L

CORNING NATURAL GAS CORPORATION,

                                    Defendant.

_____

## INTRODUCTION

Plaintiff, Thomas K. Barry ("Plaintiff" or "Barry") commenced this action against his former employer, Corning Natural Gas ("Defendant" or "CNG"), for breach of contract (First Cause of Action) and for specific performance (Second Cause of Action) as the result of CNG's breach of a Consulting, Confidentiality, and Non-Competition Agreement ("Consulting Agreement"), which provided for the assignment of a key-man life insurance policy that the company held on the Plaintiff's life ("the Barry Policy" "the insurance policy" or "the key-man policy").

The Complaint originally alleged five causes of action. *See* Compl. at Dkt. #1. The Third Cause of Action against CNG sought to recover post-retirement dental and medical benefits pursuant to the terms of a Term Sheet dated November 8, 2006. The Fourth and Fifth Causes of Action were pled against the Osborne Trust for tortious interference of a contract and *prima facie* tort. Compl., ¶¶ 20-36. By order entered July 8, 2008, this Court dismissed the Third, Fourth, and Fifth Causes

of Action in the Complaint pursuant to Fed.R.Civ.P. 12(b)(6).  *See* Dkt. #21. The Osborne Trust is

no longer a party to this action.

Plaintiff now moves for summary judgment as to CNG's liability on the First and Second

Causes of Action. *See* Dkt. #47.

## FACTUAL BACKGROUND[1]

CNG is a gas distribution company that provides metered gas, transportation, storage, and

other unbundled energy services to the Finger Lakes and Southern Tier regions of New York State.

Plaintiff was the President, Chief Executive Officer, and Chairman of the Board of Directors ("the

Board") of CNG until his resignation on November 30, 2006.  During Barry's tenure, the company

ran into financial trouble, such that by November, 2006, CNG's natural gas supplier refused to

provide it with gas for the upcoming winter season unless CNG obtained a $4 million letter of credit

as security. In addition, the New York State Public Service Commission ("PSC") threatened to issue

an order to show cause as to why a receiver should not be appointed for the company if CNG did not

secure a gas supplier by November 30, 2006.[2]

The Osborne Trust, a significant shareholder of CNG, offered to provide the necessary letter

of credit to keep the company operational. In exchange, it was agreed that CNG would effectuate

---

[1] The facts presented are undisputed.

[2] During this time, two law firms  represented  CNG and its Board of Directors: The Rich
May firm and Nixon Peabody, LLP. Eric Krathwohl ("Krathwohl") and Stephen Kane ("Kane")
were employed by Rich May, and Stanley Widger ("Widger") was a partner at Nixon Peabody
who represented the company in its regulatory matters before the PSC. *See* Pl. Exh. H, pp. 23-26.

Plaintiff's resignation, a new Board would be appointed, and Richard M. Osborne would be installed as Chairman of the new Board.

On November 8, 2006, negotiations between the Osborne Trust and CNG culminated in the issuance of a Convertible Note and Letter of Credit Term Sheet ("the Term Sheet").[3] As part of the Term Sheet's Conditions to Closing, Barry was to resign as Chairman of the Board, Chief Executive Officer and President of CNG. The Term Sheet's Conditions to Closing also provided that Barry and CNG would enter into the a Consulting Agreement, pursuant to which Barry would be paid an annual sum of $150,000 for a period of four years as consideration for severance, agreement not to compete, and for providing consulting services. *See* Pl. Exhs. A & D at Dkt. #48-1 to 48-4.  As further part of the Conditions to Closing, the Term Sheet stated that the Osborne Trust "acknowledges and approves that the Company intends to assign Mr. Barry the key-man life insurance it holds on the life of Mr. Barry." Pl. Exh. A at 7. It is this policy that is at the heart of the case.

During a Special Meeting on November 8, 2006, CNG's then-Board of Directors voted to approve the Term Sheet and move forward with the proposed transaction.  Another Special Meeting of the Board of Directors was held on November 30, 2006, during which CNG approved the execution of the Consulting Agreement, including the transfer of the key-man insurance policy to Plaintiff. Barry abstained from the Board's vote to approve the Consulting Agreement. CNG attorneys Krathwohl and Kane were present at those Board meetings during which Barry's separation

---

[3] The Term Sheet discussed in this Decision and Order is a document dated November 8, 2006, outlining the key terms of the proposed transaction between the Osborne Trust and CNG for purposes of negotiation. It is not a binding agreement, but rather describes the material terms and conditions of the potential arrangement between the parties. *See* Pl. Exh. A.

package was discussed and approved.  Following Board approval, Barry executed the Consulting

Agreement with CNG. Barry then resigned as Chairman, CEO, and President of CNG on November

30, 2006.  Richard Osborne, Trustee of the Osborne Trust, became Chairman of the Board, and the

remaining seats on the Board were filled with new members.

On or about January 2, 2007, without notice to Plaintiff, Defendant surrendered the Barry

Policy to the insurance company and received $236, 730.36. Plaintiff subsequently commenced this

lawsuit for breach of contract and specific performance on August 9, 2007.[4]

## DISCUSSION

### I.    Summary Judgment–General Principles

A court may grant summary judgment only "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter

of law." Fed.R.Civ.P. 56(c). The Court determines which facts are material by considering the

substantive law of the action, for only those "facts that might affect the outcome of the suit under

the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The initial burden rests with the moving party to demonstrate the absence of any genuine

issues of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party

satisfies its burden, the non-moving party must provide "specific facts showing that there is a

---

[4]  The cause of action for specific performance was pled before it was discovered the
CNG had cashed the Barry Policy.

genuine issue for trial" in order to survive the motion for summary judgment. Fed.R.Civ.P. 56(e); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Shannon v. New York City Transit Auth.*, 332 F.3d 95, 98-99 (2d Cir. 2003).

In considering a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party, and draw all reasonable inferences in that party's favor. *See Williams v. R.H. Donnelley Corp.*, 368 F.3d 123, 126 (2d Cir. 2004). The Court must refrain from weighing the evidence, and restrict its inquiry to whether there are triable issues of material fact. *See Anderson*, 477 U.S. at 249.

## II.     Plaintiff's Motion for Summary Judgment

In his Complaint, Plaintiff alleges that Defendant breached the Consulting Agreement when it failed to assign the life insurance policy to him, and sought an order of specific performance compelling the assignment of the policy to Barry. Plaintiff now seeks a determination of liability with damages (i.e., the value of the life insurance policy) to be determined at a later date.

In defense, CNG claims that Barry breached his fiduciary duties as director and defrauded the Board of Directors when Barry failed to disclose the contents of an e-mail communication he received from attorney Krathwohl on October 16, 2008 and made other material misrepresentations to the Board with respect to the Consulting Agreement.

### A.     The Krathwohl E-Mail

On October 16, 2006, Krathwohl sent Plaintiff an e-mail message ("the Krathwohl e-mail" or "the October 16 e-mail") in which he expressed uncertainty as to whether the New York State Public Service Commission ("PSC") would allow the assignment of the key-man insurance policy to Barry. Previously, the PSC had issued an order dated May 22, 2006 which imposed operational

requirements on company management, including a limit on compensation increases for senior

managers.  *See* Def. Exh. 1 at Dkt. #56.

    With regard to the assignment agreement, Krathwohl wrote:

> The two constraints on the propriety of the company making this grant are: (I) management's fiduciary duties, i.e. making only reasonable payments to officers, and (ii) compliance with PSC orders.
>
> On the first, you should have some backup for the assignment being reasonable (e.g., compensation studies available through industry groups or compensation experts, or as researched by the Company itself) . . . The assignment could be the basis for a shareholder claim of breach of fiduciary duty, so it's important to have the backup.
>
> Regarding (ii)...[t]he part of the order relating to payments to officers [is] not creating an absolute prohibition, but just stating that the payments would not ever be funded through customer rates was in the section about a potential merger . . . . *Thus, the rate order language at best is unclear as to making the assignment at this time and at worst, prohibits the intended assignment. This merits some further discussion.*

Pl. Exh. G (emphasis added).

    Shortly thereafter, Barry responded to Krathwohl, saying that he had elected to retire, and that

his resignation should "remove some of the legal difficulties as you stated in a recent e-mail." Barry

Reply Aff., Exh. E at Dkt. #59.

    CNG claims that Barry is not entitled to receive the policy because he breached his fiduciary

duties.  But, for the reasons discussed below,  I find that the facts of this case establish that the

transfer of the Barry policy was understood by the Board and its attorneys, that Barry did not breach

his fiduciary duty or defraud the Board in any manner,  and judgment should be entered in his favor.

    The undisputed facts state that two lawyers from the Rich May law firm, Krathwohl and

Kane,  presented the Term Sheet to the Board on November 8, 2006. The Term Sheet contained the

provision for the assignment of the key-man policy, and neither attorney voiced any concern or objection regarding the conditions of the Term Sheet.  Certainly knowledge by the Board's several attorneys can be imputed to the Board. The Board approved the Term Sheet at the November 8, 2006 meeting.

Stanley Widger, CNG's regulatory attorney from the Nixon Peabody firm, testified at his deposition that on November 17, 2006, he filed with the PSC two term sheets that had been negotiated with the Osborne Trust, including the Term Sheet that was approved by the Board on November 8, 2006. Widger testified that the Term Sheet he submitted to the PSC provided that CNG would be assigning the key-man insurance policy to Plaintiff. Pl. Exh. H at 56-57, 62-66. He further testified that on November 20, 2006, he prepared a Discussion Memorandum identifying the issues that the PSC had raised in response to the submitted term sheets. *Id.* at 69-74, 80-84. According to Widger, those issues did not involve the assignment of the Barry Policy. *Id.* Widger went on to state in his deposition that, "if I had received an expressed objection from the PSC to that assignment I would have communicated that to the company in some fashion." *Id.* at 82.

While Defendant  urges that the Term Sheet was provided to the PSC for limited purposes involving certain jurisdictional issues, it is uncontroverted that the PSC reviewed both term sheets and posed no objection whatsoever to the assignment imputed. Def. Resp., ¶¶ 38-42, 67 at Dkt. #54-1.

During the discovery phase of this lawsuit, three of the former directors of the Board were questioned regarding the Krathwohl e-mail. Former directors Robert Pollack and Bradford Faxon testified that they could not recall anyone at the Board meetings, including CNG counsel Eric Krathwohl, raising a concern regarding a potential constraint on the transfer of the Barry Policy.

7

They stated that if such a concern regarding the propriety of the transfer had been raised, it was something that should have been communicated to the Board. *See* Pl. Exh. L at 79-80; Pl. Exh. M at 41. Both men also testified that neither felt misled regarding the legality of the transaction with the Osborne Trust, and that Barry properly discharged his fiduciary duties to the Board with regard to the proposed transaction. *See* Pl. Exh. L at 147-48, 150-52; & Exh. M at 110, 116-17. The third Board member, Kenneth Robinson ("Robinson"), testified that he received a copy of the Krathwohl e-mail on October 17, 2006, for his "take" on Krathwohl's comments,  Pl. Exh. N. at 42-45, but did not recall responding to the e-mail, or discussing its contents with Barry or Krathwohl. *Id.*  Neither Barry nor counsel from Rich May raised the issue at the Board meetings, *Id.* at  64-65, 71, and Robinson stated that he also did not discuss the contents of the e-mail with the Board because "Mr. Krathwohl had . . . the opportunity to raise the issue himself, and since he didn't, I didn't feel that it was necessary." *Id.* at 79.  According to Robinson, "Rich May was involved, again, in those board meetings, and I think it was up to counsel . . . to raise the concern if they truly had one." *Id.* at 64. Like the other two Board members, Robinson testified that Barry ultimately conducted himself in a "professional and responsible manner" with respect to the Consulting Agreement. *Id.* at 76.

Here, the separation package that was agreed to was set forth in writing and nothing whatsoever appears to have been hidden from the Board.  Both Krathwohl and his colleague from Rich May had multiple occasions to communicate to the Board whether there was a concern about the propriety of the transfer of the Barry Policy, and neither did so.

Between October 16, 2006, and November 30, 2006, the Term Sheet was filed with the PSC and it did not object to the assignment clause.  On November 30, 2006, the Board of Directors voted

to approve the Consulting Agreement, and all members of the Board were aware of its contents, including the transfer of the key-man policy to Barry.

Defendant seeks to vitiate the contract on the ground that Barry "defrauded" the Board with respect to the life insurance transfer. The facts do not support the claim.    The fraud alleged by CNG occurred when Barry allegedly failed to disclose to the Board the contents of the Krathwohl e-mail, expressing "concerns" about the viability of the policy transfer. Defendant appears to concede that the statements contained in Krathwohl's e-mail do not rise to a misrepresentation or omission of a material fact, but suggests that the contents of the e-mail be characterized as "a legal opinion," which, in certain situations, can give rise to an action in fraud.  Def. Mem. at 19 at Dkt. #54.  The facts though show that the Board's own attorneys broached the issue.  This was not information peculiarly within the knowledge of Barry.  In this case, the information contained in the Krathwohl e-mail was readily available to the Board. Krathwohl was himself present at the three Board meetings in which the Consulting Agreement was discussed, as counsel to the Board and CNG.  Moreover, there is nothing in the record that suggests that the Board acted with justifiable reliance on the alleged omission, because PSC approval was never a condition of the policy transfer. *See infra* II.C.

Under these circumstances it is very clear that there was no disparity in knowledge that induced the Board to adopt the Consulting Agreement. *See West Side Fed. Sav. & Loan Assn. of N.Y. City v. Hirschfeld*, 101 A.D.2d 380 , 385-386 (1ˢᵗ Dept.),  *appeal dismissed* 63 N.Y.2d 677 (1984); *see generally* 60A N.Y. Jur. 2d Fraud and Deceit § 98 (2011).  Following a review of the record, I agree with Plaintiff that the elements of fraud have not been met with regard to the non-disclosure of the Krathwohl e-mail, and Defendant's breach of fiduciary duty claim must fail.

**B.    Misrepresentation Regarding the Compensation Package**

Defendant also contends that Barry breached his fiduciary duty and defrauded the Board by "actively misleading the Board about the fictitious financial sacrifices he claimed to be making, so that the Policy would be granted 'in lieu of' those nonexistent entitlements." Def. Mem. at 19.

During the November 8, 2006, Board Meeting at which the Term Sheet was first considered by the Board, attorney Stephen Kane of the Rich May firm "gave a detailed description of the Term Sheet," which provided for the Osborne Trust to provide a letter of credit to Virginia Power on behalf of CNG. Pl. Exh. B at 1. "Mr. Kane explained that the conditions to closing on the letter of credit included Mr. Barry resigning as Chairman and CEO" and "accepting a substantially reduced severance package from what he was legally entitled to." Pl. Exh. B. at 2. The November 30, 2006, Board resolution approving the transfer of the Barry Policy recited that Barry was receiving the policy and payments "in lieu of the substantially greater payments and benefits available to Mr. Barry under his existing Severance Agreement (which severance agreement shall be cancelled)." Pl. Exh. C at 2.

Defendant now claims that the statement from attorney Kane somehow warrants a conclusion that Barry breached his fiduciary duties. In general terms, Kane explained the terms and conditions attached to the closing and recited the nature of Barry's compensation and the consideration that he received for resigning, for agreeing to a non-compete clause and for agreeing to continue to act as a consultant. The Board and the attorneys representing the Board were aware of the proposed package and Barry's previous level of compensation and other benefits.

It is undisputed that on November 30, 2006, Plaintiff resigned as CEO, President, and Chairman of the Board of Directors following 30 years in CNG's employ. At the time of his

departure, Barry was earning an annual salary of $220,000. When he agreed to leave the company, Barry forfeited his annual salary and entered a non-compete and consulting agreement that provided him a consulting fee of $150,00 per year for four years, with a total amount not to exceed $600,000, and provided for the assignment of the key-man life insurance policy. *See* Consulting Agreement at Pl. Exh. C.

Plaintiff, relying on the terms of the Consulting Agreement, resigned from CNG. The Board of Directors voted in favor of the Consulting Agreement after CNG, Barry, and the Osborne Trust agreed to a transaction that was mutually beneficial to all concerned. Defendant suggests that the Board was somehow duped into voting to approve the Consulting Agreement because it was unaware of the total dollar value of the benefits provided for by the 2006 Consulting Agreement as compared to Barry's 2001 severance package. This is pure speculation and is belied by the facts. There are no facts in the record to support this conclusion, and such a bare conjecture is insufficient to defeat Plaintiff's motion for summary judgment. *See Sasannejad v. Univ. of Rochester*, 329 F.Supp.2d 385, 393 (W.D.N.Y. 2004).

### C.    PSC Approval

Defendant also belabors the notion that the PSC may also not have known the value of the Barry Policy, and that there is no evidence that the PSC ever considered the assignment clause in the Term Sheet. Def. Mem. at 20. Significantly, Defendant's argument overlooks the fact that PSC approval was not a condition of the Consulting Agreement, *see* Pl. Exh. D at 4, and there is no evidence provided by CNG that would suggest that the policy transfer was otherwise illegal. *See generally Adams-Mitchell Co. v. Cambridge Distributing Co.*, 189 F.2d 913 (2d Cir. 1951).

In any event, it is undisputed that Term Sheet containing the assignment provision was submitted to the PSC and was reviewed by their attorneys. Pl. Exh. H at 65-68 & Exh. I. The PSC invoked its jurisdiction to approve certain items in the Term Sheet, and raised certain issues in response to both term sheets that were filed by Widger. Pl. Exh. J. The assignment of the key-man policy did not prompt any discussion by the PSC. Krathwohl, Widger, and the PSC were all aware of the transaction, the whole purpose of which was to remove Barry from the company and ultimately to install new management. In light of the fact that the Consulting Agreement was presented to the Board with its own attorneys present after the Term Sheet had been reviewed by the PSC, compels the conclusion that Plaintiff neither breached a duty nor committed fraud with respect to the Consulting Agreement.

In sum, the company agreed to this separation package and shortly after agreeing to it, willfully breached one of the essential terms by cashing the policy that belonged to Plaintiff. Simply because a new Board of Directors was installed under Osborne does not give CNG *carte blanche* authority to rescind or modify the terms of a contract negotiated and executed by the prior Board. The fact that the new Board was composed of members not favorably disposed to Barry is of no moment.

It is also worth mentioning that the key-man policy is the only item in Plaintiff's Consulting Agreement that CNG took steps to cancel. Defendant not only did not object to Barry's four-year, $150,000 annual consulting fee, it acknowledged at oral argument that it had in fact paid Barry his consulting fee in accordance with the terms of the Agreement. It is significant to me that Defendant only attacks this particular provision of the Consulting Agreement, i.e., the insurance policy, and

12

not the entire separation package. Under these circumstances, I find no justification for CNG's cashing of the Barry Policy.

For all of the foregoing reasons, I find that no genuine issue of fact exists regarding whether CNG breached the Consulting Agreement, and Barry is entitled to partial summary judgment as to liability.

### III.    Defendant's Counterclaims

CNG has filed three counterclaims. Def. Answer, ¶ 29. Count I seeks legal fees in the amount of $39,000 as the prevailing party with respect to Count III of this action, which I dismissed from the bench on June 27, 2008.  *See* Dkt. #20. Plaintiff contends that Defendant is not entitled to attorneys' fees pursuant to the terms of Article 10 of the Consulting Agreement. *See* Pl. Exh. D at 9.

At this juncture, I find it would be premature to rule on this issue. Following the issuance of this Decision and Order, there may be questions as to whether Plaintiff is entitled to fees. Discovery is therefore necessary to ascertain the amount of legal fees so that the reasonableness of both parties' fees can be assessed, and whether any recovery may be credited against any legal fees that Plaintiff may seek to recover. Accordingly, I defer decision at this time as to Defendant's first counterclaim.

With regard to the remaining two counterclaims, the undisputed facts in this case establish that CNG breached the Consulting Agreement it had with Barry when he left the employ of CNG. Plaintiff's motion for summary judgment and Defendant's counterclaims of fraud and breach of fiduciary duty are mutually exclusive, and in light my determination of Defendant's liability, Defendant's counterclaims II and III are dismissed.

**CONCLUSION**

Plaintiff's motion for partial summary judgment (Dkt.#47) is granted, and Defendant's Counterclaims II and III are dismissed.

The parties have thirty (30) days to confer and advise the Court of a time frame for resolving the  monetary value of the key-man insurance policy.  A status conference, if necessary, will be scheduled at the Court's discretion.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
      October 11, 2011.

14